# WURTS v. HARRINGTON.

PATENTS; INTERFERENCES; BURDEN OF PROOF; REDUCTION TO PRACTICE.

1. In an interference proceeding between a patentee and an applicant for patent, the patentee is entitled to no advantage of position in the controversy where the applicant's application was filed prior to that of his rival, and had not been abandoned; and the burden of proof in such case is on the patentee.

2. But while the burden of showing reduction to practice in such a case is on the junior applicant, it is not so onerous as to require him to show it beyond a reasonable doubt.

3. In such a case the tribunals of the Patent Office should be guided by the ordinary rules of courts of law in respect of the burden of proof.

4. Where the inventor of an electrical device has completed his invention and made trials of it before skilled electricians, to his and their satisfaction, in connection with the working system of electric lighting used in a factory, although the device was never incorporated into and made a part of that system or of any other working electrical plant, but the conditions were equally complete and satisfactory for the demonstration of the practical utility and value of the device, the invention will be held to have been reduced to practice.

No. 50. Patent Appeals. Submitted January 13, 1897. Decided February 10, 1897

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding. *Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. Wesley G. Carr* for the appellant.

*Mr. John C. Perrine* and *Mr. Francis T. Chambers* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

The controversy in this case involves the priority of invention of an electrical device called an "automatic circuit-breaker."

The issue in controversy is defined thus:

"A fixed contract-point, a movable conducting part making normal contact therewith, a wire of fusible metal in shunt around said parts, and means whereby the parts are automatically separated on the occurrence of an abnormal current."

The decision of the examiner of interferences was in favor of Alexander Wurts, and he was affirmed on appeal to the examiners-in-chief; but the acting Commissioner reversed their decision and awarded priority to Walter Eugene Harrington.

Wurts' application was filed on October 26, 1892, and he received a patent thereon June 26, 1893. He receives and, in fact, claims no advantage of position in the controversy on account of said patent, because the application of Harrington had been on file without abandonment since February 24, 1891. The evidence on behalf of Harrington shows, and is conceded to show, conception and reduction to practice by him between December 1 and 4, 1890. He was then an electrician in the service of an electric railway company at Atlantic City, N. J., and his device was tested and used in its operation. He took immediate steps also to bring his invention into commercial use, and it was advertised and noticed in periodicals devoted to electrical engineering, as well as described in a book descriptive of electrical railways that was published late in the fall of 1892. There was no conflict in the evidence of the parties, and the decision must

turn upon the credibility of the witnesses for Wurts and the weight to be given their testimony in support of his claim to invention and reduction to practice prior to that of Harrington, for upon him, as junior applicant, is cast the burden of proof.

Wurts was at the time of his alleged conception, and is now, an electrician in the employ of the Westinghouse Electric and Manufacturing Company, of Pittsburg, Pa., for whose benefit his inventions were made and patented. He testified to the conception of the invention about July 3, 1889, and produced a note-book, upon which no suspicion has been cast, showing a sketch and brief description of such a device, which, however, is not identical with this later drawing, that is shown on his application. He further testifies that on April 29, 1890, he made a new drawing, from which his device was constructed in the machine-shop of the Westinghouse Company. This drawing was produced and is the same as that shown in his application. It has endorsed on it the said date and the names of Wurts and of one Francis Petit Mann. He says that the device or machine was completed and finished in a suitable manner for commercial use, and was placed in the exhibition-room of the company and there tested. It was operated in the presence of some of the employees of the company and of other persons and worked satisfactorily. When the new exhibition-room was built the machine was not taken there, but sent to the laboratory, where it remained some time and then disappeared. There is no evidence as to what disposition was made of it. Wurts says that he fully appreciated its value, and reported it to the patent solicitor of the company, as usual, and urged application for a patent. He could not state why no application was made, unless because the company was then making and had on the market other devices used for the same general purpose.

Francis Petit Mann, referred to above, was also an electrician employed by the said company, and testified to having

the drawing shown and explained to him by Wurts on April 29, 1890, and to have written his name and said date on the said drawing.' He also saw the finished device, made in accordance with the drawing, and corroborated Wurts as to its operation with success in the exhibition-room of the company.

Charles F. Scott and A. S. Morris, both electrical engineers in the employ of the Westinghouse Company, testified to the manufacture of the device substantially as represented in the drawings, and to its frequent and successful trial in the exhibition-room of the company. This exhibition-room was one used for displaying the machines and devices of the company, and was supplied with electrical connections, by which they could be operated in the presence of the electricians and often of the customers of the company. One other witness testified on behalf of Wurts, but there is nothing in his testimony of any value in this consideration.

The device does not appear to have been used in a practical electric system, but was operated in the exhibition-room by "short-circuiting" the wires from a generator in use in the lighting system of the building. The current carried was equivalent to that usual in ordinary lighting-circuits, in which, among others, the device would be used, and the tests made were sufficient to demonstrate its practical utility.

The testimony shows that it could readily be adapted to stronger currents, when needed, by enlarging the wire and increasing the contact area in due proportion.

If the evidence on behalf of Wurts, briefly stated above is true, it sufficiently shows invention and reduction to practice before the date of Harrington's. The witnesses are evidently men of intelligence and skill in their profession, and there is nothing in the record tending to impeach their character and credibility. But one of them, Wurts himself, can have any direct interest in the controversy. Of course, witnesses are not discredited merely because they

may be employees of the beneficiary of the letters patent. In respect of their credibility the acting Commissioner says in his opinion: "Admitting the honesty of the witnesses for Wurts, and there is nothing to indicate that they have not stated the facts to the best of their knowledge and belief, still I do not think that Wurts has made out a case of practical use beyond a reasonable doubt. In view of the facts stated and the decisions noted, his efforts must be considered only as abandoned experiments."

Assuming that the "practical use" mentioned is the equivalent of "reduction to practice," and so meant, we think that the acting Commissioner erred in concluding that it must be established beyond a reasonable doubt. Disregarding the patent obtained by Wurts, for the reasons before given, the controversy was between two rival applicants for patent for the same invention, and whilst the burden was necessarily cast upon the junior applicant, it should not have been made so onerous in its requirements. There is no reason why, in cases like the present, the tribunals of the Patent Office should not be guided by the ordinary rules of the courts of law in respect to the burden of proof. Where a patent has been regularly issued, and a question of anticipation or priority is raised in a suit for infringement or in proceedings in interference, a different rule prevails. Of this character are the cases cited and relied on in the opinion of the acting Commissioner. *Deering* v. *Winona Harvester Works,* 155 U. S. 286, 301; *The Barbed Wire Patent,* 143 U. S. 275, 285; see also *Coffin* v. *Ogden,* 18 Wall. 120, 124; *Wells* v. *Reynolds,* 4 App. D. C. 43, 48. And the same rule applies in another class of cases equally distinguishable from this. *Morgan* v. *Daniels,* 153 U. S. 121, 124; *Hisey* v. *Peters,* 6 App. D. C. 68, 71. There is, too, a very material difference in respect of character and weight between the evidence in support of priority in this case and that shown in the record in *The Barbed Wire Patent* and *Deering* v. *Winona Harvester Works.* The oral testimony in

those cases of similarity between the patented devices and the claims in opposition, coming after great lapse of time and from persons generally if not entirely without special qualifications in such matters, was entirely without support in a single writing, sketch, drawing, model, or completed device. The evidence was plainly unreliable, and received the following criticism in the opinion of the court:

"Granting the witnesses to be of the highest character, and never so conscientious in their desire to tell only the truth, the possibility of their being mistaken as to the exact device used, which, though bearing a general resemblance to the one patented, may differ from it in the very particular which makes it patentable, are such as to render oral testimony peculiarly untrustworthy; particularly so if the testimony be taken after the lapse of years from the time the alleged anticipating device was used."

In the case at bar the original drawing made by Wurts was produced, attested by his own signature and that of another witness and bearing date April 29, 1890. It was either made at the time or has been manufactured since with fraudulent intent. The drawing furnished the foundation of the application for the patent. It was identified and explained by the witnesses under a careful and intelligent cross-examination. These were all intelligent and skillful electricians, who had seen and understood the drawing at the time. They saw the device made up from the description in the drawing, and witnessed the test of it several times, and were satisfied with its practical operation and utility. There is no room for mistake on their part.

The loss or breaking up of the machine after these successful tests, and the delay in applying for a patent, are the only circumstances tending to cast the least suspicion upon the truth of Wurts' claim; and these, without regard to their attempted explanation, are not of sufficient weight in themselves to warrant us in refusing credence to the evidence of invention and reduction to practice. The same

may also be said of the circumstance that between the time of this invention and the application for patent thereon Wurts took out other patents for lightning-arresters and analogous devices.

We cannot, therefore, agree with the opinion that the evidence on behalf of Wurts fails to establish reduction to practice. The invention was complete and produced the result sought to be accomplished by the inventor to his satisfaction and that of the skilled electricians who witnessed the practical tests that were several times made. These trials were made in connection with the working system of electric lighting used in the factory, though the device was never in fact incorporated into and made a part of that system or of any other working electrical plant. Still, if the competent witnesses who observed the trials closely are to be believed at all, the conditions were equally complete and satisfactory. for the demonstration of the practical utility and value of the device. This we think was a compliance with the well-established rule in respect of reduction to practice. *Coffin* v. *Ogden,* 18 Wall. 120; *Gaylor* v. *Wilder,* 10 How. 477; *Coffee* v. *Guerrant,* 3 App. D. C. 497; *Colhoun* v. *Hodson,* 5 App. D. C. 21, 23; *Shellaberger* v. *Sommer,* 8 App. D. C. 3; 1 Rob. on Pat., Sec. 128.

In our judgment the difficulty with the proofs of reduction to practice is not that they show an abandoned experiment, but rather that they tend to show an abandonment to public use. The machine as made for trial was more than a model. It was complete in all its parts. Its trial demonstrated its capacity for general use, without addition or improvement, and it was not laid aside for attempted improvement or as imperfect in its action. With other cut-out devices under manufacture and sale, it may be that the Westinghouse Company did not consider it worth while to manufacture this one and to apply for a patent upon it, and was only stimulated to the action taken after the lapse of two years from the successful trials of the device by the

practical efforts of Harrington in the same direction. That issue, however, is not in the case, and can have no effect upon the sole question for determination, which is, who, as between Wurts and Harrington, must be regarded as the first inventor?

Notwithstanding the commendable diligence of Harrington in endeavoring to bring the invention into public use after his conception of it, and the negligence of Wurts in that respect, we are constrained, by the view taken of the evidence and the law applicable thereto, to hold that Wurts is entitled to priority.

For the reasons given, the decision of the acting Commissioner must be *reversed, and it is so ordered. The proceedings and decision herein will be certified to the Commissioner of Patents for his action in the premises, in accordance with the terms of the law.*