## UNITED SHOE MACHINERY CO., v. L. Q. WHITE SHOE CO.

(District Court, D. Massachusetts. November 21, 1919.)

No. 700.

1. Patents ☞178—Invention of doubtful utility held not pioneer, entitled to broad equivalents.

The invention of a machine for inserting blind eyelets in shoes, which consisted in substituting for an anvil in a machine for inserting visible eyelets a thinner piece of metal, which would go between the leather and lining without disturbing their relative position, and which was of doubtful utility and achieved no commercial success, is not a pioneer invention, entitled to a broad range of equivalents.

2. Patents ☞328—1,143,740, for machine for setting blind eyelets in shoes, held valid.

The Wales patent, No. 1,143,740, for a machine for setting blind eyelets in shoes, *held* valid, though of doubtful utility, when the general language is restricted to the means described in the patent or substantial equivalents.

3. Patents ☞168(2)—Fact that claim was amended after defendant began manufacturing is to be considered.

The fact that a claim in a pending application for a patent was amended by inserting therein language broad enough to include defendant's invention, which was not included within the original claim, after defendant began manufacturing his machine and placing it on the market, is to be considered in determining the scope to be given to the range of equivalents in plaintiff's patent.

4. Patents ☞328—1,143,740, for machine for setting blind eyelets in shoes, held not infringed.

The Wales patent, No. 1,143,740, for a machine for setting blind eyelets in shoes, *held* not infringed by defendant's machine, when its claims are restricted, as they must be sustained.

5. Patents ☞328—1,143,741, for process for setting blind eyelets in shoes, held invalid.

The Wales patent, No. 1,143,741, covering a process for setting blind eyelets in shoes, *held* invalid, as covering only the function or operation of a machine.

6. Patents ☞7—Process patent, covering merely function of machine, is void.

A process patent, which covers nothing more than the mere function or operation of a machine, is void.

In Equity. Suit for infringement of patent by the United Shoe Machinery Company against the L. Q. White Shoe Company. Bill dismissed.

Fish, Richardson, Herrick & Neave, A. D. Salinger, and Emery, Booote, Janney & Varney, all of Boston, Mass., for plaintiff.

Francis J. V. Dakin, of Boston, Mass., for defendant.

JOHNSON, Circuit Judge. This is a suit in equity, in which the plaintiff alleges infringement by the defendant of two letters patent of the United States, Nos. 1,143,740 and 1,143,741, issued June 22, 1915, to Alfred B. Wales, assignor to the plaintiff company. The first is for a machine for setting blind eyelets in shoes, and the second, entitled "Art of Shoe Making," is for a method of setting blind eyelets in shoe uppers.

The defenses to the suit for infringement of certain claims of the machine patent are invalidity, lack of invention and utility, and noninfringement; and to the method patent that the claims in issue are void, as being no more than the functions of a machine, and as being anticipated and lacking invention.

The application for the machine patent was filed May 4, 1912. At this time no machine for inserting blind eyelets in shoe uppers had been invented. Patents had been granted for several machines for setting visible eyelets in shoe uppers. Some of them were designed to set eyelets in one side of a shoe upper, in a step by step process, by punching the holes and inserting the eyelets, and others to set eyelets in both sides of a shoe upper in a continuous step by step process, first punching the holes, and then setting eyelets in the holes thus punched. In the process of setting the eyelets on both kinds of machines the eyelet was inserted from the outer or leather side of the upper and clinched upon the inside of the lining. In the machines by which eyelets were set in both sides of the upper simultaneously the parts of the two sides of the upper, which were to be eyeletted, were brought into contact with an intermediate anvil and the eyelets, when inserted from the leather side of the upper, were clenched upon the inside of the lining. Previous to the application of Wales for the machine patent in suit blind eyelets, had been set by punching the holes upon one of the machines for setting visible eyelets and then the leather part of the upper was turned back and the eyelet set by a foot-power machine; the eyelets being inserted from the inside of the lining of the upper and clinched upon the lining beneath the leather of the upper. For this operation it was first necessary to prepare the upper by cementing together the leather and the lining in the position which they would assume in the finished shoe, but leaving them unattached at their edges, so that the leather could be readily turned back after the holes had been punched through both it and the lining, and the eyelets then inserted from the inside of the lining and clinched upon the side next to the leather and beneath it. It was then necessary to stitch the leather and lining of the upper together along their edges and to undertrim the same. This had been the method practiced in shoe factories throughout the United States from about the year 1905 down to the time of Wales' application for his machine patent.

Wales, a stitching room machinist at the factory of the Regal Shoe Company at Whitman, Mass., conceived the idea that blind eyelets might be set in one operation by use of one of the machines then in use for setting visible eyelets in both sides of a shoe upper simultaneously, known as the Duplex machine. He testified that this had been suggested to him by his father. He attempted to use the Duplex machine for the setting of invisible eyelets, by placing one side of a shoe upper upon the Duplex machine, so that the lining side would be upon one side of the anvil which was used for clinching the eyelets and the leather side upon the other. He then stopped one of the raceways which fed eyelets to the leather side of the upper and allowed the eyelets to be fed from one raceway only, so that the Duplex machine, as thus modified, would punch holes in both the leather and the lining parts of an upper and an eyelet be inserted upon its lining side and clinched

against the anvil beneath the leather side of the upper. He found, upon experiment, however, that the anvil of the Duplex machine, when used for setting invisible eyelets, was so thick that he did not obtain a proper alignment between the hole punched in the leather and the eyelet which had been set in the lining, and while invisible eyelets could be set upon the Duplex machine, so much subsequent labor was necessary to procure proper alignment of the hole in the leather with the eyelet set in the lining that this method was of no commercial value. It then occurred to him that he might diminish the size of the anvil upon which the eyelet was clinched beneath the leather and upon the lining part of the upper. This was the dominant feature of his invention. He conceived the idea of inserting a thin plate of metal with an anvil upon it, between the leather and the lining, which should have a slot in it through which a punch could pass, punching the leather upon one side of it, and also punching the lining, which was arranged upon the other side. For putting this idea into successful operation it was necessary that the plate of metal, with the anvil upon its lower side, should be so thin that the relative position of the leather and the lining would not be materially changed from that which they would occupy in the finished shoe. He found that one of the machines which had been used for setting visible eyelets in one side of a shoe upper, only, was better adapted to carry out his idea than the Duplex machine, which had been used for setting eyelets in both sides of a shoe upper simultaneously. He therefore selected the Glass-Peerless machine upon which his idea could be ingrafted, and with such changes in this machine as would be readily suggested to one familiar with its operations he succeeded in setting invisible eyelets in shoe uppers. In his application for a patent he describes the attachment which he would make to the old eyeletting machines in order to set blind or invisible eyelets as:

"A plate, formed preferably from a relatively thin, flexible sheet of metal; the plate 2 comprising a body portion and a shank portion. The shank portion is mounted upon a small plate or block which serves to hold the part 2 above the table, so that the lining in which the eyelets are to be set may pass under the part 2, while the outer part of the quarter may pass over the said part 2, running from the front to back of the part 2, and substantially parallel is an opening 8 through which the punch 11 may pass. The opening 8 is of a sufficient length so that it will not interfere with the feed movement of the punch, and it extends in the direction of the feed to and through the neck portion 10 of the part 2. The part 2 is provided with a projecting portion 9, the neck 10 of said portion 9 being downwardly bent, so that the punch 11, when moving forward to feed the stock, will pass out of the opening 8 and over the forward projection 9. On the under side of the projection 9 is secured an upsetting die or upper set member 12, which co-operates with the set 13 of the machine; and when the punch has completed its forward feed movement it is directly over the upper set 12. The forward feed movement of the punch causes the neck portion of the part 2 to disengage the under portion 6 of the upper from the point of the punch and the engagement of the punch with the superposed portion 7 of the leather carries the upper forward until the upper setting die is located in the hole just formed by the punch in the lining. When the punch is in this position the underset 13, with the eyelet 14, is moved upwardly and the eyelet is inserted and set in the lower portion 6. The part 2, together with its projecting end 9 may be made of comparatively thin sheet material, because, by the time the eyelet is set, it is backed up by the punch and is therefore held rigidly and prevented from yielding. After the eyelet is set the punch moves upwardly and toward the right and again

descends through the slot 8, cutting holes in both upper and lower pieces 7 and 6. and again feeds the stock forward, stopping directly over upsetting die 12 on the projection 9, and another eyelet is then set in the lower portion of the upper and the operation repeated."

There were only five claims in the original application, in all of which—"an intermediate plate, comprising a body portion, a projecting portion and a curved, connecting neck, said neck and body portion being slotted to permit the passage of the punch and said projecting portion being provided with a setting member to co-operate with the set of the machine," was set out as the dominating feature of his invention in combination with a punch and lower set of an eyeletting machine.

The method of operation, briefly stated, was to secure the lining and the leather of the upper in the normal position which they would assume in the finished shoe by cementing them together, but leaving the edges unstitched, so that the leather could be placed on one side of this attachment or plate and the lining upon the other side. The punch of the machine then punched a hole through the leather, passed down through the slot, and punched the lining. The upper was then moved along automatically by the machine to where the plate was bent downward, when the lining was stripped from the end of the punch by the downward bending of the plate, and the leather part remaining upon the punch was moved along until the punch, in the hole in the leather, was over the upsetting die 12, which was on the lower side of the neck 9 of the plate. The eyelet was then inserted in the lining and by the lower set in the machine pressed up against the upsetting die 12 on the projecting neck 9. The punch, being held in the leather above the upsetting die 12 at this time, served to back up the upsetting die when the eyelet was forced against it. In order that the hole in the leather part might be in alignment with the eyelet set in the lining, it was necessary that the intermediate plate be made very thin; and while the invention had utility, I think it can be well characterized as of a doubtful character as, because of its thinness, the plate would not stand the pressure exerted upon it when the eyelet was forced up against the upsetting die 12, and also because the edges of the upper had to be stitched and undertrimmed after the eyelets had been set. Several pairs of shoes in which blind eyelets had been set in the uppers by the use of the intermediate plate described in Wales' invention were filed as exhibits by the plaintiff; but the testimony conclusively shows that the patent to Wales, restricted to the intermediate plate, had little commercial value, and Walter Shaw, manager of the eyelet department of the plaintiff, testified that in August, 1916, when he gave his deposition in this case, the company had but one Duplex machine with the Wales attachment in operation, and only 12 had been put out by the plaintiff. Amendments were made to the original claims by the insertion of additional ones on June 1, 1914. The principal feature of these amended claims was that the intermediate plate, described in the original claims, was broadened into "means for clinching the barrel of the eyelet upon the lining and beneath the outer portion of the upper before the tool is withdrawn from the upper"; the tool referred to being the punch of the machine.

[1] It is claimed by the plaintiff that this was a pioneer patent, and therefore entitled the patentee to a broad range of equivalents. But "the range of equivalents depends upon and varies with the degree of invention." Paper Bag Case, 210 U. S. 405, 28 Sup. Ct. 748, 52 L. Ed. 1122; Ives et al. v. Hamilton, Executor, 92 U. S. 426, 23 L. Ed. 494; Hoyt v. Horne, 145 U. S. 302, 12 Sup. Ct. 922, 36 L. Ed. 713; Deering v. Winona Harvester Works, 155 U. S. 286, 15 Sup. Ct. 118, 39 L. Ed. 153.

In view of the prior art and the use to which the Duplex machine could be put in setting invisible eyelets, I do not think that Wales can be said to be a "pioneer," in that he produced a wholly novel device which would entitle him to a broad range of equivalents. When he had before him the Duplex machine, with its thick anvil, the problem presented was how to make the anvil thinner, so that the relation of the leather of the upper to the lining might not be so disturbed that the hole in the leather would not register with the eyelet when set in the lining. While making the anvil thinner, and inserting it between the leather and the lining, more nearly accomplished the result which he desired, I do not think it can be said it was invention of a high order, which entitled him to a broad range of equivalents, to cut down the thickness of the intermediate anvil and to provide an attachment to an old machine.

The language of the court in Deering v. Winona Harvester Works, 155 U. S. 286, 295, 15 Sup. Ct. 118, 121 (39 L. Ed. 153) seems to me applicable:

"But in view, not only of the prior devices, but of the fact that his invention was of doubtful utility and never went into practical use, the construction claimed would operate rather to the discouragement than the promotion of inventive talent."

[2] While I think that the patent in suit was valid, yet I think it was of doubtful utility, and that the broad and general language, "means for clinching the barrel of the eyelet upon the lining beneath the outer portion of the upper," should be restricted to the means described in the patent or substantial equivalents.

"A patent, covering generally any and every means or method for producing a given result, cannot be upheld." O'Reilly v. Morse, 15 How. 62, 14 L. Ed. 601; Le Roy v. Tatham, 14 How. 156, 14 L. Ed. 367; The Telephone Cases, 126 U. S. 531, 8 Sup. Ct. 778, 31 L. Ed. 863.

The defendant makes use of an old machine for setting visible eyelets, known as the Peerless-Glass machine, which is equipped with the Muther punch, for which a patent was issued October 6, 1914, on an application filed January 31, 1914. The Muther punch is an adaptation of the punch of the old Peerless-Glass machines, which was used for setting visible eyelets, to do the work of setting invisible or blind eyelets, by changing its form and making necessary mechanical changes in the old machine. The old punch was tapered at its end, a shoulder placed upon it, and above this shoulder the punch was contracted. In the operation of the machine with this punch the lining and the leather of the upper are stitched together at their edges and undertrimmed before the upper is placed upon the machine. The punch, under the

automatic operation of the machine, penetrates the leather and the lining; the upper, with the punch in both leather and lining, is moved automatically forward, and an eyelet is placed upon the tapering end of the punch, and then by the operation of the machine the eyelet is forced upward on the punch until its barrel, which had been scored, so that it may be easily split and turned, is brought in contact with the leather upon the punch, and forces it up over the shoulder, which is made sufficiently small to permit it to pass down through the hole in the leather of the upper, in which it is assisted by the contracted portion of the punch; the shoulder then interposes a barrier to the further upward movement of the eyelet on the punch, and the eyelet is turned over and clinched by the shoulder upon the lining and beneath the leather of the upper. During the whole of this process the punch remains in both the leather and the lining of the upper, and the shoulder upon the punch is placed at the right distance from the end of the punch, so that it will pass down through the hole when the leather is forced up by the eyelet.

It is claimed by the plaintiff that the defendant, in the use of the Muther punch, infringes its patents, because it places an anvil between the leather and the lining of the upper for the purpose of clinching the eyelet upon the lining and beneath the leather of the upper; that this constitutes one of the "means for clinching the barrel of the eyelet upon the lining and beneath the outer portion of the upper before the tool is withdrawn from the upper," which is covered by the claims of its machine patent; that the shoulder upon the Muther punch, though an integral part of the punch, is a substantial equivalent of the upsetting anvil *12* upon the lower part of the projecting neck *9* of the Wales invention; that in the Wales invention the punch remaining in the leather is above this upsetting anvil, and presses down upon it at the time the clinching of the eyelet takes effect; so that, while the upsetting die and the punch are separate, yet, when the process of clinching takes place, they act as a unit.

[3] In considering the scope which should be given to the range of equivalents of the Wales patent in connection with the device used by the defendant, the history of the progress of the Wales patent through the Patent Office is illuminating. This discloses that the broad claims which were included in the Wales patent by way of amendment were not added until several months after Muther filed an application for his patent.

In Railway Co. v. Sayles, 97 U. S. 554, 563 (24 L. Ed. 1053), the court said:

"Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has, in the meantime, gone into public use."

The Peerless eyeletting machine, equipped with the Muther punch for setting invisible eyelets, was first used for commercial purposes in the early part of 1914, and it appears from the testimony that during the month of February of that year there were put out for this purpose 20 in March, 30 in April, 12 in May, and 8 in June. So that, before

the amendments were made to the Wales patent, the Peerless machine, equipped with the Muther punch, had come into public use, and according to the testimony, which is uncontradicted, 64 of these machines were placed with shoe factories by the Peerless Company upon a royalty basis. The plaintiff's use of the Wales patent in the form in which it was described by the patentee in his application was confined to a few machines; but three or four months after February, 1914, and after Muther had filed his application, it put out an eyeletting machine equipped with a punch substantially the same as the Muther punch.

[4] In view of these facts, I think the machine patent in suit should be limited in its range of equivalents to any anvil which may be interposed between the leather and the lining of a shoe upper when the edges are unstitched and not undertrimmed; and I do not think the Muther punch, used by the defendant, is a substantial equivalent, for in its use the edges of the upper are stitched and undertrimmed before the process of setting the eyelets is undertaken, and during the operation no part of the punch, which has penetrated both leather and lining, is withdrawn from either; but the whole upper, after the punching has taken place, is moved forward with the punch still in both leather and lining until the eyelet is presented by the lower set of the machine.

[5] I think the process patent must be limited to the machine as described, and as so limited it is void as representing only the functions of a machine. Everything about the patent is old, except the interposition of an anvil to clinch the eyelet between the leather and the lining. The clinching of an eyelet was old, and the only point in which the method disclosed by the process patent differed from the prior art was in the place where the clinching took place. The means for clinching were not operating means, but the instrument which was introduced between the lining and the leather for the purpose of effecting the clinching at that place.

[6] Wales had invented an attachment which, applied to one of the old eyeletting machines for setting visible eyelets, would effect the clinching of an eyelet upon the lining and below the leather. This method which he employed, as shown by his machine, for effecting the clinching at this point, did not entitle him to treat as infringers all who by any method whatever should effect the clinching of an eyelet upon the lining and beneath the leather of an upper; and if confined to the attachment which he described, it would be invalid as covering nothing more than the mere function or operation of a machine, which is not patentable. Corning v. Burden, 15 How. 252, 14 L. Ed. 683; Burr v. Duryee, 1 Wall. 531, 17 L. Ed. 650; Westinghouse v. Boyden Power Brake Co., 170 U. S. 537–557, 18 Sup. Ct. 707, 42 L. Ed. 1136; National Hollow B. B. Co. v. Interchangeable B. B. Co., 106 Fed. 693–708, 45 C. C. A. 544.

I therefore find that the process patent, No. 1,143,740, is invalid. I find that the machine patent, No. 1,143,741, is valid, but of doubtful utility, as it never came into general commercial use; that it is entitled to a narrow range of equivalents, and is not infringed by the defendant's machine.

The bill is dismissed, with costs to the defendant.