PEELLE CO. v. RASHKIN et al.

(Circuit Court of Appeals, Second Circuit. March 9, 1915.)

No. 191.

PATENTS ⊚328—VALIDITY AND INFRINGEMENT—HATCHWAY DOORS—PRIOR USE.

Evidence of prior use of the device of the Rashkin patent, No. 871,735, for hatchway doors, considered, and *held* insufficient to defeat the patent, within the rule requiring such evidence to be clear and convincing. The patent also *held* infringed.

Appeal from the District Court of the United States for the Eastern District of New York.

This cause comes here upon appeal from so much of the decree as dismisses the bill as to Tillie Rashkin, one of the defendants in a suit brought to restrain infringement of United States Patent No. 871,735, granted November 19, 1907, to Joseph Rashkin, the other defendant, with respect to whom the bill was sustained.

See, also, 194 Fed. 440.

The invention consists of an improvement in hatchway doors, which are divided in the middle and open up and down. Each pair of doors is connected by chains over pulleys, so that the movement of the upper door controls the movement of the lower door. In the prior art the wide-open position of such doors was determined by having the upper door abut against some sort of stop. Hence the lower door was, at that time, supported by the chains. If it were subjected to any shock or strain, when in its wide-open position, the strain was directly imposed on the supporting chains and, as they could not yield (the upper door then resting solidly against its stop), the tendency was to break them. For this reason, with such doors, it was always the practice to adjust the length of the chains so that, when the doors were wide open, the upper edge of the lower door would be far enough below the floor level to prevent it being struck by the wheels of the trucks used in carting loads into and out of the elevator. This arrangement had two well-known disadvantages: In the first place, it made a depression over which the wheels of the trucks must bump; and, in the second place, the depression would retain whatever dropped off the tracks, and this would interfere with the closing of the doors. Rashkin removed the stops from the top half of the door and put on the lower half of the door very strong stops, so positioned that, when the doors were

wide open, the upper edge of the lower door was flush with the floor, thus forming a truckable sill or bridge, and thus avoiding a slot to collect rubbish, while at the same time the chains were wholly relieved of all shocks and strains imposed on the top of the lower door.

J. Edgar Bull and Fred H. Bowersock, both of New York City, for appellant.

Charles F. Dane and C. S. Champion, both of New York City, for appellees.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge. There is no question as to infringement. Nor is there any as to the proposition that Joseph Rashkin, the patentee, cannot defend on the ground of invalidity of the patent which he himself assigned to complainant's predecessor in title.

No prior art disclosed in patents or publication negatives invention. The decision below was based entirely upon an alleged public use two years prior to the date of application. The contention is that in 1899 or 1900, five years prior to the date of application (June 14, 1905), Joseph Rashkin, as an employé of Caleb M. Peelle (who was president of complainant company when this suit was brought), made and installed in an elevator shaft in the plant of the Manhattan Refrigerating Company in this city five sets of elevator doors which embodied the patented apparatus. Five witnesses testified as to these doors. Rashkin, the patentee and defendant, Starr, Lane, Scanlon, and Ludemann. Referring to this testimony, the District Judge finds that Rashkin's testimony is clear and circumstantial that he produced a model which he verified by a personal inspection of the doors shortly before testifying; that Starr was in a position to know, and was perfectly clear in his recollection; that his veracity and impartiality were conceded; that his testimony, which was not in the least impaired by cross-examination, "seems to be superior in weight to the testimony of complainant's witnesses." Of the complainant's witnesses, he finds that Lane and Scanlon "were indefinite and uncertain," and that, while Ludemann displayed considerable knowledge of the complainant's door construction, his testimony "is not of the convincing quality that characterizes Starr's statements." He concludes with the statement that, in view of the direct and convincing testimony of the defendants, he is impressed by the "failure of the complainant to produce any direct evidence to the contrary," and adds that "if the doors, or any of them, are still in use, it would have been easy to show what the construction was."

None of these witnesses were examined in court. The judge had no opportunity to observe their demeanor on the stand. All that he had was the printed record which is before us. The appellant is therefore entitled to our independent judgment as to the relative weight of their testimony.

Rashkin testified that he went to work for C. M. Peelle, doing business as the Standard Supply Company, in 1896, and stayed with him six years; that in 1899, at Peelle's request he put in five pairs of doors in the Manhattan building; that they had the crossbar and stops of

the patent; that about 1907 he had a man repair the doors with some new chains and pulleys, and saw them after the job was done; that he saw the doors three weeks before testifying, and they were the same doors he had put in. However clear and circumstantial his testimony may have been, his statement that he installed these doors "with stops" on them in 1899 is his recollection merely of what took place 13 years before, without reference to any record to fix the date. Moreover, he is one of the defendants, pecuniarily interested in the result of the suit. He is also the patentee, who, when making his application in 1905, swore that such doors had not been in use for more than 2 years before that date. He explained this last statement by saying that in 1905 he had an imperfect knowledge of the English language, and did not understand what he was swearing to. It seems to us that his testimony is entitled to little weight.

The witness Starr, a mechanical engineer, was president of the Starr Engineering Company. He was consulting engineer for the Manhattan Company, and drew the plans for their warehouse and equipment, and supervised the installation of the same. The warehouse was erected in 1896 or 1898 (it is given 1906 or 1908 in the record, which is manifestly a printer's error). This witness also testified wholly from memory, except that he says that he has refreshed his recollection as to the date he removed his office from the Manhattan Building (May 1, 1890), by reference to his books of account. He says he saw the doors for some time before and some time after that date. No one disputes the proposition that the doors are the same, nor that they are now provided with crossbar and stops; the question is, Were they so equipped prior to 1903? This witness testified that the lower door had a strengthening bar across its top, extending on each side over the guide rail in such a manner that when the door was open, and therefore the lower half of the door was down, so that the top would be flush with the floor, this bar engaged on each side with a stop placed on the rail, so as to hold the lower half of the door from going below the floor level and the top of the door filled the space between the platform of the elevator and the floor in such a manner as to form with the platform and the floor a practically continuous surface, so that trucks could be conveniently wheeled from the floor to the platform or vice versa.

Being merely consulting engineer, he did not have occasion to see them regularly after he left the building, but says the doors were in use up to about 1902.

The complainant's witness Lane has been since 1903 engineer to the Stock Exchange. He testified that he was in the employ of the Manhattan Company from 1899 to 1903, for three years as roustabout and one year as engineer; that there were gates when he came, which were soon changed to these fireproof doors. He says the doors were like defendant's model, except that there were no stops to prevent the door from dropping in case the chains broke. When opened, the top edge of the lower half of the door dropped below the floor a couple of inches; that the only stop that he ever saw was the chain that came through the pulley; that four or five times he helped the carpenter re-

pair the chains that "were broken on one side, which would let the door drop on one side"; that when he repaired them he had to get a pry underneath and hold it up in place while repairing; that the lower door sections had a piece of iron on the top and side; that whenever he saw them lowered their tops were below the floor level.

Complainant's witness Scanlon, who is now engineer of the Presbyterian Hospital, testified that he was chief engineer at the Manhattan Building from 1896 to 1902; that he remembered that while he was there they substituted for the light gates' sliding doors—when the upper half was lifted the lower half would go down; that there was no positive means provided for arresting the lower door in its descent at a point where its top edge would be supported substantially flush or level with the floor; that sometimes it would stop flush, then again from an inch to an inch and a half below the floor level; that he knew of nothing which limited the drop; that it never stopped twice in the same place; that the engineering department was called upon repeatedly to "dig out the dirt." This phrase he explained by saying that, when the top of the door dropped below the floor level, the ice from the barrels of frozen poultry, pieces of barrel hoop, and rubbish would "pack in over the door in the slot in the floor"; that there was never any trouble when the doors stayed at the same level, but that they had trouble with them right up until he left in December, 1902.

Complainant's witness Ludermann, now in business for himself, testified that he worked for the Standard Supply Company (with which Rashkin was employed), from August, 1903, to 1911; that on two occasions during such employment he was sent to the Manhattan to make repairs to these doors; that on one of these occasions a door had broken loose from the chains and was jammed between the tiller sheave and the pit of the hatch; that the doors when he saw them were not of the "truckable sill" type; that is, they were not held by stops flush with the floor, but the top of the lower door was set so far below the floor level that a wheel or rolling object would not touch it. The prior use date relied on by defendant must be anterior to June 14, 1903. This witness, it may be noted, did not begin his employment until August, 1903.

We fail to see why the evidence for complainant is not as "direct" as that for the defendant. When A. says he saw a door and it had a certain device on it, and B. says he saw the same door and it had no such device on it, the testimony of each is equally direct. As to the suggestion that there should have been produced a photograph or description by a competent witness of the doors still in use, we fail to see what bearing that would have on the question. No one disputes that the doors are the same, nor that they are now equipped with the "stop" devices. The only question is when those devices were applied. Leaving out Ludemann, who only visited the place twice, surely both Lane and Scanlon were in as good a position to know what was there as Starr was. There is nothing to indicate that they were not as veracious and impartial as Starr; nor is their testimony, any more than his, impaired by cross-examination. Nor is it "indefinite and uncertain"; quite the contrary.

All that we have touching this alleged prior use is the not infrequent case of fairly balanced testimony of disinterested and impartial witnesses, not the clear, convincing proof which is required when it is sought to establish a prior use of a date more than 10 years back by oral testimony. We are not satisfied that such prior use has been proved. The Barbed Wire Patent, 143 U. S. 275, 12 Sup. Ct. 443, 450, 36 L. Ed. 154; Deering v. Winona H. Works, 155 U. S. 286, 15 Sup. Ct. 118, 39 L. Ed. 153; Parker v. Stebler, 177 Fed. 210, 101 C. C. A. 380; National Hollow B. B. Co. v. Interchangeable B. B. Co., 106 Fed. 693, 45 C. C. A. 544.

The conclusion above reached makes it unnecessary further to discuss the case, but we may add that, in our opinion the estoppel of Joseph Rashkin to attack the validity of his own patent disposes of this case. His wife Tillie has invested money in the business, and he contends that she alone is interested; he being merely her general manager. We do not find the testimony of the defendants persuasive, but think it is really his business; the wife being brought in with the expectation thereby of avoiding estoppel.

Decree reversed, with costs, and cause remanded, with instructions to decree for complainant against both defendants.