23 C.C.P.A.(Patents)

## SCHWARTZ v. GRAENZ.

### Patent Appeal No. 3528.

Court of Customs and Patent Appeals.

Feb. 17, 1936.

768

Henry E. Stauffer, of Washington, D. C., for appellant.

Gifford, Scull & Burgess, of New York City (George F. Scull and William F. Wilder, both of New York City, of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal in an interference proceeding from the decision of the Board of Appeals of the United States Patent Office reversing the decision of the Examiner of Interferences awarding priority of invention to appellant.

The invention in issue relates to a non-run knitted fabric, and a method for making the same.

The fabric is made up of the usual courses and wales, with certain of the loops shifted lengthwise and laterally into an adjacent wale in an adjacent course.

Of the eleven counts in issue, 1 to 11, inclusive, counts 1 and 7 are illustrative. They read:

"Count 1. A non-run knitted fabric formed of courses and wales of loops, with substantially each wale containing a multiplicity of loops each of which has a bight portion thereof displaced from an adjacent existent wale and from an adjacent course, and the courses wherein such displaced loops occur being in such close proximity as to render substantially the entire extent of the fabric of a non-run character, by limiting the breaking effect of any loop of the fabric to a very small number of loops in the wale in which the break occurs."

"Count 7. That method of rendering a knitted fabric of a substantially non-run character throughout, during the fabrication thereof, which consists in knitting the fabric in course after course of loops, and in substantially every existent wale, in a multiplicity of courses substantially throughout the fabric, laterally shifting predetermined loops each to an adjacent wale in an adjacent course."

The interference is between appellant's application, serial No. 618,289, filed June 20, 1932, and appellee's patent No. 1,856,-053, issued April 26, 1932, on an application filed October 8, 1931.

The counts in issue originated in appellee's patent, No. 1,856,053, and were copied by appellant for interference purposes.

As appellant's application was not filed until after appellee's patent issued, appellant is the junior party, and the burden was upon him to establish priority of invention beyond a reasonable doubt.

It appears from the preliminary statements of the parties that appellant claimed conception, disclosure to others, and reduction to practice on or about October 9, 1923; and that appellee claimed conception, disclosure to others, and reduction to practice on or about April 30, 1931.

Preliminary to a discussion of the issues and the evidence in the case, it may be said that appellant received patent No. 1,470,490, issued October 9, 1923, on an application filed September 25, 1919, for a non-run knitted fabric, and a method for making the same.

Appellant's patented non-run knitted fabric is made up of the usual courses and wales, with certain of the loops *stretched* laterally so that they extend over two wales *in the same course* in which they originated.

The fundamental difference between the fabric at issue and that covered by the Schwartz patent is that in the former certain loops are *shifted* lengthwise and laterally *into an adjacent wale in an adjacent course*, whereas in the Schwartz patented fabric certain of the loops are *stretched laterally* so that they extend over two wales *in the same course* in which they originated.

It appears from the record that the Berkshire Knitting Mills, a manufacturer of hosiery, located at Wyomissing, Pa., is

making non-run hosiery under the Schwartz patent, No. 1,470,490, probably as a licensee; and that the Textile Machine Works of Wyomissing, Pa., engaged in manufacturing full-fashioned knitting machines and parts, and the Berkshire Knitting Mills, although separate corporations, are controlled, as stated in the brief of counsel for appellant, by the "same interests."

Appellant Schwartz testified that he conceived the present invention about one year subsequent to the filing of his application, September 25, 1919, on which patent No. 1,470,490 issued October 9, 1923; that he disclosed the present invention to his attorney, Mr. Denes, who at that time was prosecuting his 1919 application; that Mr. Denes was of opinion, as was Mr. Root, who succeeded Mr. Denes as appellant's attorney in the prosecution thereof, that the involved invention was fully covered by that application (neither Mr. Denes nor Mr. Root was called as a witness); that he explained the present invention to his attorneys, Mr. Denes and Mr. Root, orally and by the motion of his fingers, no drawings thereof having been made by him until some time in 1931, and stated to Mr. Root "that in case it is not mechanically advantageous to make form No. 1, form No. 2 may be easier adaptable to a full fashioned machine"; that subsequent to the issuance of his patent, and prior to June, 1926, he made several unsuccessful attempts to interest various hosiery manufacturers in his patent, such as the Phœnix Hosiery Mills, Julius Kayser, Van Raalte, Osborn, the Rivoli Hosiery Mills, and others whose names he did not remember, and disclosed to them samples of his patented fabric and the fabric of the present invention, sometimes one, sometimes the other, and sometimes both (no witness was called from any of those concerns to corroborate appellant's testimony); that, in the early summer of 1926, he disclosed the present invention to the witnesses Emil Max Müller, an employee of the Textile Machine Works of Wyomissing, Pa., supervisor of the erection of full-fashioned hosiery machines and attachments therefor, Christian F. Meyer, chief draftsman of the same company, and Mr. Emil Richter, foreman of the Berkshire Knitting Mills; that he showed these witnesses a sample of his patented non-run fabric, Exhibit No. 4, as well as a sample of a non-run fabric disclosing the present invention, Exhibit No. 5, hereinafter described, and, after fully explaining the arrangement of, and the difference in, the stitches used in producing those fabrics, on July 26, 1926, entered into an "option agreement" with the Berkshire Knitting Mills (Appellant's Exhibit No. 14) for the sale of all his rights, title, and interest in and to his patent No. 1,-470,490 for the sum of $7,500, $1,000 of which was paid at the time of the signing of the agreement, and the balance, $6,500, was to be paid within 30 days thereafter, in the event the Berkshire Knitting Mills desired to exercise its rights under the agreement to the consummation of the sale and the execution and delivery to it of a formal assignment of appellant's patent rights.

It may be observed at this point that the balance of the purchase price was not paid by the Berkshire Knitting Mills, and the patent was not assigned to it.

Relative to the meeting on July 26, 1926, of the parties to the "option agreement," the witness Christian F. Meyer stated that he dictated a memorandum, introduced in evidence as Appellant's Exhibit No. 20, wherein it appears that, in addition to appellant Schwartz, the following persons were present: Messrs. F. Thunn, G. Gastrich, M. Zwicky, M. Mueller, Wm. F. Mueller, H. Hemmerich, E. Richter, and C. F. Meyer (only two of whom, Richter and Meyer, were called as witnesses by appellant); that the subject of the discussion at that meeting had to do with the purchase of appellant's patent, and, among other things, "the practical workability as well as the cost of *the attachment* [to full-fashioned machines] necessary to make *the lock stitch*." (Italics ours.) No reference is made in that memorandum to more than one lock stitch, nor to more than one "attachment."

Exhibit No. 4 is a knitted fabric about 11½ inches long and 3¼ inches wide, mounted on a piece of cardboard. It is made up of the ordinary knitting stitch, except for an insert, about 6 inches in length and about one inch in width, consisting of appellant's patented non-run knitted fabric made by *stretching* certain of the loops throughout the fabric *laterally* so that they extend *over two wales in the same course* in which they originated.

Exhibit No. 5 is a knitted fabric about 8½ inches long and 7 inches wide, mounted on a piece of cardboard. It is made up of the ordinary knitting stitch, except for an insert, about 6½ inches in length and 1½ inches in width, consisting of a sample

of the non-run fabric in question, wherein certain loops throughout the fabric are *shifted lengthwise and laterally* "to an adjacent wale in an adjacent course."

Appellant further testified that he made Exhibits Nos. 4 and 5, and left them with the Textile Machine Works in the summer of 1926, and that, so far as he knew, they remained with that concern, or with the Berkshire Knitting Mills, until "late in the Fall of 1931." He later qualified that statement by saying that when the "Textile Machine Company * * * did not exercise their option, they returned those samples to * * * [him], and * * * [he] had them in * * * [his] possession until the time when * * * [he] started negotiations with the Apex Hosiery," in December, 1931, at which time, he stated, he "handed" them to Mr. William Meyer, president of the Apex Hosiery Company, who did not testify in the case, and the witness Mr. F. Elwood Struve, who testified for appellant.

It appears from the testimony of the witness Struve that he received Exhibits Nos. 4 and 5 from appellant in December, 1931, and, some time thereafter, showed them to Mr. Gustav Gastrich, employed by the Textile Machine Works, and that early in January, 1933, prior to the taking of the testimony in this case, turned them over to Mr. Gastrich, who was not called as a witness.

Appellant further testified that in May, 1930, he called at the Vogue Silk Hosiery Company, Philadelphia, Pa., and there met a Mr. Frost and a Mr. Frank Titleman, neither of whom was called as a witness, and appellee's witnesses Ernest Tither, vice president and "mechanical man and superintendent" of the Vogue Silk Hosiery Company, and Mr. Samuel Tait, president and treasurer of that company and, at the time of the taking of the testimony in this case, a director but not a stockholder of the Non-run Fabric & Machine Company, owner of appellee's patent; that he did not disclose to those persons the details of the stitch forming the patented fabric or the stitch forming the present invention; that he there met the appellee Alfred Graenz, who at that time was making so-called "heel attachments" for the Vogue Silk Hosiery Company; that he made an appointment with the appellee to see him the following day, at which time, he stated, they discussed plans concerning the construction of an "attachment" suitable for the making of appellant's patented fabric; that appellee thought he ought to have about $75 or $80 per week and a "small additional interest," if he were successful in making such an "attachment"; that a memorandum contract was prepared and left with appellee; that two or three days later he again called on the appellee, who stated that he was not in position to do more than to work on the suggested "attachment" evenings, Sundays, and holidays, and that as he had confidence in appellant, it would not be necessary to sign the agreement referred to; that on several occasions he explained in detail the construction of the patented fabric, form No. 1; that, about one month thereafter, appellee appeared to be discouraged in his efforts to design an "attachment" capable of making appellant's patented stitch; that appellant then explained to appellee the details of the stitch forming the fabric of the present invention, form No. 2, and made suggestions relative to the construction of an "attachment" suitable for the making of it; that he saw appellee frequently thereafter; that in July, 1931, appellee told him that he had completed "the attachment" and was ready to do business with him, and showed him a piece of fabric, the construction of which, the witness stated, he could ascertain by close inspection; that he examined it to ascertain how it was constructed (however, he made no statement relative to its construction); that there was some discussion relative to a contract between the parties at that time; that, about two months thereafter, he called on appellee and suggested the drawing up of a contract that would be mutually satisfactory; that appellee stated that, due to certain work he then had on hand, he would be unable to do anything in the matter for about one week or ten days; that, about two weeks thereafter, he again called on appellee, who again stated that he would be unable to do anything for a few days; that the witness Lewis Marcus, an attorney at law who testified for appellant, called on appellee in October, 1931; that, thereafter on several occasions, he attempted to get appellee to enter into some sort of contract with him but was unsuccessful; and that appellee at the time told him he had made "an attachment," and had filed patent papers for a mechanism, but made no reference to the fact that his patent application included a fabric. The witness identified certain proposed contracts, Exhibits 8, 9, and 10, sub-

mitted to appellee by him, none of which were signed by appellee.

Exhibit No. 8, which was dated June, 1930, had reference to an "attachment" to be constructed by appellee suitable for the making of appellant's patented fabric, and the remuneration appellee was to receive therefor.

Exhibit No. 9, dated 1931, was apparently submitted to appellee in July of that year. It relates, among other things not of interest here, to the formation of a corporation for the manufacture and sale of silk hosiery and similar products, and the machinery and attachments for the manufacture thereof. For 51 per cent. of the stock of the proposed corporation, appellant was to assign all his rights, title, and interest in and to his patent. Appellee was to receive 25 per cent. of the stock, in consideration of which he was to assign all his rights, title, and interest in and to a "certain device, attachment or machine capable of manufacturing the said fabric described or contained in the patent owned by Schwartz above described."

Exhibit No. 10, dated December, 1931, is a proposed agreement between the parties relative to a mechanical attachment for a full-fashioned hosiery machine to be perfected by appellee for the making of a non-run knitted fabric "such as is contemplated by appellant's patent."

On cross-examination, appellant testified that, although he had shown appellee samples of his patented fabric and also of the fabric corresponding to that here involved, he did not show him Exhibits Nos. 4 and 5. He further testified that he had disclosed forms Nos. 1 and 2 to his sons Irving and Ira Schwartz some time in 1924, and that they made samples of fabric conforming to both. This testimony was corroborated by appellant's sons, who, in 1924, were approximately 17 and 13 years of age, respectively.

The witness Emil Max Miiller testified that in June, 1926, appellant showed him Exhibits Nos. 4 and 5, and explained in detail how each was made. We quote from Miiller's testimony with regard thereto:

"I noticed in this fine piece of fabric [Exhibit 4] there was 3 holes in it. I asked him permission, if I could put another hole into it, to prove it to myself if this fabric really doesn't run. I took my pen knife, cut a fourth hole in it and tried to make it run, but it didn't. * * *

"A. There was no other holes in it, but from the left side of the bottom about 2 inches from the corner where that new loop formation started, there was a runner through the plain fabric, that runner was about a half inch wide, all the way down, and from the right side of the top hole about an inch and a half over there was a large hole and a smaller hole about a thirty second loops or thread between that large and small hole. * * *

"Q. 16. Were there any other holes in that fabric to make you state you put a fourth hole in that fabric? A. Yes, there was 3 holes in it, one of them was connected with the small hole, but I wanted to have to prove to myself. * * *

"A. The coarse fabric [Exhibit 5] did have on the bottom from the left side about an inch and a half from the corner where this new loop formation started a runner all the way down to the plain fabric about ¾ inch wide. The same thing on the right side about an inch and a half inward there is a runner going up the same width as the one going down. Then I noticed one single stitch about ¾ inward from that runner and about an inch and a half high there is a loop or a stitch which is very noticeable. Also on the right side where the insert of new loop formation is, that does not go straight up on the needle wale, there is about a half inch on the right side that loop spread over when the needle follow to the right.

"Q. 23. What part of the coarse fabric were you describing when making the last part of the previous statement? A. The insert part of the fabric where that new type loop formation was made. * * *

"A. I recognize this piece of fabric [Exhibit 5] through having on the left side from that inserted piece of non-run fabric a runner all the way down to the plain fabric. The same thing on the right side, specially I recognize it on that one stitch which is in that plain fabric,—everybody can see that.

"Q. 55. Which stitch are you referring to, Mr. Miiller? A. That is that single stitch, single funny stitch. * * *

"Q. 56. Why should such a feature just referred to make such an impression on you that you would recollect that this peculiarly shaped hole was in the original fabric shown you by Mr. Schwartz in 1926? A. The plain fabric knitted would not show a stitch which we see here in this

piece of plain fabric except something has happened with a needle or the man who knit it tried to make a different loop.

"Q. 57. Are there any other features of the fabric, Exhibit 5, that would help you to recognize the same? A. On the right side I see that by spreading over the loops he did not keep up with the same needle wale, on the top he did come one needle wale far to the right. This I mentioned to Mr. Schwartz when I examined this sample in Philadelphia. * * *

"Q. 66. Are there any other features of the coarse fabric, Exhibit 5, that help you in identifying this as the original coarse piece of fabric shown you by Mr. Schwartz in 1926? A. The way I explain it before, that this fabric I recognize by this two wide runners on the left side going down, the right side going up, and this funny looking stitch in the plain fabric."

The witness further stated that it was his practice to examine fabrics, and that he had examined probably hundreds of them during the period from June, 1926, to January, 1933, when his testimony was taken; that two weeks prior to the giving of his testimony he had seen Exhibits Nos. 4 and 5 at a meeting held in the offices of the Textile Machine Works. It appears from the record that, in addition to the witness, there were present at that meeting, among others, appellant and his counsel, Mr. Gastrich, and the witnesses Ernest Richter and Christian F. Meyer, and that the meeting was called for the purpose of discussing the issues of this case.

The witness Emil Richter testified that he was foreman of the Berkshire Knitting Mills in charge of machines "and things in general"; that, in July, 1926, appellant showed him Exhibits Nos. 4 and 5, and explained the construction of the fabrics represented thereby. The witness was shown those exhibits, and, with them before him, described certain peculiarities by which he was able to recall that they were the fabrics disclosed and explained to him in 1926, and, among other things, said:

"A. The fine piece of fabric, Exhibit No. 4, is a very peculiar way made. It's surrounded by a plain piece of fabric on four sides with about a inch and a quarter by 5 inch non run fabric, inside; besides it has four distinct holes in it which were in already when I first seen it. While the coarser piece of fabric, Exhibit No. 5, has two distinct runners and also the plain

fabric on the outside with about an inch or an inch and a quarter by 5 inch non-run fabric in the middle. * * *

"A. These two runners in Exhibit No. 5 were in the same place and had the same width when I first seen them.

"Q. 35. When you saw the coarse fabric, Exhibit No. 5, in 1926, were there any other features in the fabric that would now help you to recognize the coarse piece of fabric, Exhibit 5, as the original piece of fabric? A. There was another distinct mark in No. 5 fabric, which is a small dot caused by a needle or a sinker not functioning right, which is a distorted loop in the plain piece of fabric. That's all.

"Q. 36. Will you locate that feature in the coarse fabric, Exhibit 5? A. Sure, there it is. * * *

"Q. 37. What is so peculiar about that dot, you refer to, to make such an impression on you that you remember it at this time? A. Well in the piece of fabric, it is such a odd looking loop that it is something which every one's eyes catch right away."

The witness further stated that he saw appellant about five or six times in 1926, and had not seen him again until he attended the conference held in January, 1933, hereinbefore referred to, at which time, he said, Mr. Gastrich, superintendent of the Textile Machine Works, took Exhibits Nos. 4 and 5 out of an envelope, and showed them to the parties present, which incident he described in the following manner:

"A. He told me that this were this fabric which I had seen in '26, and I asked him where this fabric had kept so long and he said Mr. Struve just brought it up. * * *

"A. It was about in the middle of the meeting, where he came in with an envelope and opened that envelope and showed us the two pieces of fabric. * * *

"A. I believe the meeting was called for the purpose of showing the fabrics again.

"Re-D. Q. 356. Was the general non-run situation talked of? A. Yes, it was discussed."

Christian F. Meyer, chief draftsman of the Textile Machine Works, testified that he had met appellant in July, 1926 (he fixed the date by reference to the memorandum dictated by him, Exhibit No. 20, hereinbefore referred to), at which time he

said he saw Exhibits Nos. 4 and 5. The witness testified with the exhibits in his hands.

The witness F. Elwood Struve, general manager of the Apex Hosiery Company, testified that he received Exhibits Nos. 4 and 5 from appellant in December, 1931; that he showed them to Mr. Gustav Gastrich of the Textile Machine Works in the latter's office in January, 1932; that he again showed them and gave them to Mr. Gastrich in January, 1933, prior to the taking of the testimony in this case.

Appellee Graenz, an expert in knitting and hosiery machinery, testified that he met appellant in the spring of 1930 at the Vogue Silk Hosiery Mills; that appellant explained his patented fabric, and stated that an attachment to a full-fashioned machine was necessary in order to make it; that the witnesses Mr. Tait and Mr. Tither were present; that, although not a regular employee of the Vogue Silk Hosiery Mills, he was an expert and employed for the purpose of making "heel attachments"; that after listening to appellant's explanation of his non-run fabric, he gave appellant his card with his name and address thereon, and stated that he might be able to do something, and for appellant to call at his home; that several days later appellant called at his home and suggested that a satisfactory agreement should be entered into by them; that appellant again explained his patented fabric and expressed the desire that appellee perfect an attachment for a full-fashioned machine so that the fabric could be utilized in a commercial way; that, for a period of about nine months he made many unsuccessful attempts to perfect such an "attachment"; that during that period of time appellant contributed nothing either for appellee's time or for necessary expenses incurred by him; that he had many conversations with appellant on the subject; that various contracts were submitted to him by appellant, to which he did not agree, and, therefore, did not sign; that appellant did not disclose to him the fabric of the involved invention, nor the stitch by which it was made; that, on the contrary, on April 30, 1931, after making many unsuccessful attempts to perfect an "attachment" for the production of appellant's patented fabric, he discovered that he could make a non-run fabric (the one here involved) by shifting certain loops laterally into an adjacent wale in an adjacent course, and, shortly thereafter, perfected an attachment

for making the involved non-run fabric; that he made drawings of the present invention, and an attachment for making the same, and disclosed them to others; that in July, 1931, he perfected a full-fashioned machine on which he made complete stockings in conformity with the involved invention, and, on October 6, 1931, filed his application, which matured into the patent here involved; that in July, 1931, he told appellant that he had perfected a non-run fabric (the one here involved) and an attachment for a full-fashioned machine for making it; that he showed appellant a sample of the fabric, but did not explain how it was made; that on December 15, 1931, when appellant and his attorney submitted Exhibit No. 10—a proposed contract to be entered into by the parties, hereinbefore referred to—he again showed appellant a sample of a fabric conforming to the involved invention; that appellant said "it" looked like his "stitch," "I said no, that is my stitch," appellant then replied, "Maybe you are right, it is a different stitch"; that in July, 1931, after he had invented the fabric in issue and an attachment to a full-fashioned machine for making it, he perfected an attachment and also made drawings thereof for making appellant's patented fabric, and, although he never did, was willing, therefore, to enter into a contract with appellant, and accept a subordinate interest in a company formed for the purpose of leasing, selling, or otherwise disposing of *appellant's patented fabric and appellee's attachment* for making it.

The witnesses Samuel Tait, president and treasurer of the Vogue Silk Hosiery Company, and a director, but not a stockholder, of the Non-run Fabric & Machine Corporation, and Ernest Tither, vice president, "mechanical man and superintendent" of the Vogue Silk Hosiery Company, each testified that in the spring of 1930 appellant visited the latter company, and disclosed to them his patented fabric and the stitch by which it was formed; that he did not disclose to them the involved invention or make any reference to it, but, on the contrary, according to the testimony of the witness Tait, stated that the stitch of which his patented non-run fabric was formed "was the only stitch that wouldn't run."

Due to the views we hold, we deem it unnecessary to enter upon a discussion of the evidence relative to appellee's activi-

ties prior to the filing of his application October 8, 1931.

The Examiner of Interferences held that appellant was in possession of the invention at least as early as 1926. His conclusion was based upon the testimony of appellant, and the corroborative testimony of appellant's sons Irving and Ira Schwartz, Emil Max Miiller, Emil Richter, and Christian F. Meyer. He further held that, as appellant was in possession of the invention and had interested appellee in the general subject-matter, that is the perfection of an attachment for a full-fashioned machine capable of making appellant's patented fabric, it would be presumed, although the testimony of appellant and appellee was conflicting in that regard, that appellant disclosed the invention to appellee; and, accordingly, awarded priority of invention to appellant.

The Board of Appeals sustained that portion of the decision of the examiner holding that appellant had conceived the invention and made samples thereof at least as early as 1926, long prior to any activities on the part of appellee. In so doing, the board stated that, in view of the age and relationship of appellant's sons Irving and Ira Schwartz, it recognized the danger of placing too great reliance on their testimony, but, because of its clearness and positiveness, it was entitled to considerable weight.

Relative to appellant's alleged disclosure of the involved invention to the witnesses Miiller and Richter, the board stated: "Coming now to the events of 1926, in which the party Schwartz was endeavoring to interest manufacturers of Reading in his patented fabric, we find that the knitting machine expert, Miiller, testified in the last paragraph of page 226 of the Schwartz record that Schwartz described both fabrics to him and that he particularly examined Form No. 2 with his magnifying glass and found that it was, as stated by Schwartz, spread over to the next wale in the following course. We also find that Richter, who was skilled in the art, on page 278 of the Schwartz record, in the answer to Q. 18, states that Schwartz stated to him in effect that one of his fabrics was made by stretching the loop from one needle to another in the next course. The spreading of the loop into the next course appears to be the way in which the structure of Form No. 2 is described by some of the witnesses. The party Graenz con-

tends that after six and one-half years these witnesses must have possessed remarkable memories to testify as to all of the details and Graenz calls attention to the fact that the fabrics had been inspected by these witnesses a short time before the testimony was taken. *It perhaps does appear to be a little remarkable that these witnesses could have remembered with exactitude the many details of the fabrics referred to in their testimony, and of course we appreciate that they were interested witnesses. We have no evidence, however, impeaching their truth and veracity and when two witnesses highly skilled in the art positively testify that in 1926 Schwartz had described to them the stretching or spreading of the loops into the next course, we think their testimony is entitled to great weight.*" (Italics ours.)

The board concluded, however, that the samples of the involved invention made by appellant did not amount to a reduction of the invention to practice, and were nothing more than abandoned experiments; that appellant had failed to establish beyond a reasonable doubt that he had disclosed the invention to appellee; that appellee was an original inventor of the subject-matter of the issue, and was entitled to an award of priority. We quote from the board's decision:

"On the whole, therefore, while some suspicion is created by the party Schwartz' earlier conception of the invention and by the fact that, after he had interested the party Graenz in work along this general line, Graenz should have produced the same fabric that Schwartz had made years before, we can find nothing in the actions of the parties which we consider justifies a holding that the party Schwartz has established beyond a reasonable doubt that he communicated the invention to the party Graenz.

"The Examiner of Interferences, at the middle of page 9 of his decision, indicates that the surrounding circumstances tend to support the testimony of Schwartz rather than of Graenz. Even if this were so, that does not establish Schwartz' case beyond a reasonable doubt. It is our opinion, however, that the surrounding circumstances, after the meeting of the parties, do not even support Schwartz' contention by a preponderance of evidence. We consider that, as far as these circumstances are concerned, the question is still open to speculation and that it is impossible to de-

termine with any confidence what the truth of the matter really is. Under these conditions, we believe that we are not justified in holding that the party Graenz is untruthful when he states that he is an independent inventor."

The only evidence submitted by appellant tending to establish his conception of the invention in issue prior to appellee's filing date, October 8, 1931, is oral testimony.

In order to establish that he conceived the invention as early as 1924—a date not accorded him by either of the tribunals of the Patent Office—appellant relies on his testimony and that of his two sons, whose testimony was taken some 8½ years later, and who, as hereinbefore noted, were about 17 and 13 years of age, respectively, in 1924.

The sons testified in detail as to a disclosure of the involved invention to them by their father in 1924, and stated that they had made samples of the fabric at that time, and described the method by which such samples were made. However, on cross-examination their memories were somewhat faulty regarding certain incidents and facts, which, in view of their very clear recollection of others relative to the involved invention, they might well be expected to remember.

The witnesses Emil Max Miiller and Emil Richter testified that in 1926 appellant disclosed to them his patented fabric and the fabric here involved, and that they then saw Exhibits Nos. 4 and 5. Although their testimony was taken approximately 6½ years later, they described those exhibits in minute detail. It is true that at a meeting, hereinbefore referred to, which was held for the purpose of discussing the issues in this case two weeks prior to the taking of their testimony, the witnesses examined Exhibits Nos. 4 and 5, and were told in substance by Mr. Gastrich, superintendent of the Textile Machine Works, that they had seen them in 1926. The probabilities are, therefore, that their ability to give such a minute description of those exhibits was due to their more recent examination of them, rather than to an independent recollection of them as of 1926.

The witness Meyer was also present at that meeting, and, although he had the opportunity of examining the exhibits, he stated he did not do so, but merely held them in his hands.

The fact that there were conferences between appellant and the witnesses Miiller and Richter, and that the witness Meyer was present at one of them, is not doubted, nor is the fact that the Berkshire Knitting Mills entered into an option agreement in July, 1926, with appellant for the purchase by that company of appellant's rights, title, and interest in and to his patent No. 1,470,-490. However, there is absolutely nothing in the memorandum, Exhibit No. 20, nor in the option agreement, Exhibit No. 14, to indicate that any of the representatives of the Berkshire Knitting Mills or the Textile Machine Works had any knowledge of any non-run fabric, except the one covered by appellant's patent. In view of the differences in the fabrics represented by Exhibits Nos. 4 and 5, and the fact that the representatives of those two companies, including the witnesses Miiller, Richter, and Meyer, and others who did not testify, were business men and experts in the art involved, it is a strange circumstance that no reference was made in either of those exhibits to the non-run fabric here at issue.

There are three other exhibits of record which, it would seem, ought, under ordinary circumstances, to corroborate appellant's claim that he was in possession of the involved invention prior to appellee's filing date—Exhibits Nos. 8, 9, and 10, proposed contracts submitted to appellee by appellant.

As hereinbefore stated, Exhibit No. 8 was dated June, 1930, Exhibit No. 9, 1931, presumably July, and Exhibit No. 10, December, 1931, and in none of them is there any reference to any non-run fabric, except the one covered by appellant's patent.

Appellant admits that he did not disclose the fabric of the present invention to appellee for at least a month after he had explained to him the stitch of his patented fabric.

Appellant, without any corroboration, attempts to explain away his failure to produce some tangible documentary evidence relative to his possession of the involved invention, by saying that he was informed by his attorneys, Mr. Denes and Mr. Root, who prosecuted his application which matured into patent No. 1,470,490, that the fabric embodying the involved invention was covered by his application then pending in the Patent Office, and it is argued that, for that reason, no particular mention

was made of the involved invention in any of the exhibits of record.

It may be observed that, although appellant was making considerable effort during the period from 1923 to 1931 to dispose of his invention to various hosiery manufacturers, he never made a drawing of the stitch forming the fabric of the present invention until 1931.

■ Although, of course, oral testimony may be ·sufficient to establish priority of invention, or to warrant a favorable decision to the party producing it on the issue of originality, it should, in the absence of any corroborative documentary evidence, be carefully scrutinized, particularly where it is adduced, as in the case at bar, 6½ to 8½ years after the happening of· events. See Frank Jardine et al. v. Elmer C. Long, 58 F.(2d) 836, 19 C.C.P.A. (Patents) 1243; Galamb v. Gilmer, 68 F.(2d) 967, 21 C.C.P.A. (Patents) 918; The Barbed Wire Patent, 143 U.S. 275, 12 S.Ct. 443, 450, 36 L.Ed. 154; Deering v. Winona Harvester Works, 155 U.S. 286, 15 S.Ct. 118, 123, 39 L.Ed. 153; Symington Co. v. National Malleable Castings Co., 250 U.S. 383, 39 S.Ct. 542, 543, 63 L.Ed. 1045; Eibel Process Company v. Paper Company, 261 U.S. 45, 43 S.Ct. 322, 327, 67 L.Ed. 523.

In the case of Deering v. Winona Harvester Works, supra, the court made the following pertinent observation: "Granting the witnesses to be of the highest character, and never so conscientious in their desire to tell only the truth, the possibility of their being mistaken as to the exact device used, which, though bearing a general resemblance to the one patented, may differ from it in the very particular which makes it patentable, is such as to render oral testimony peculiarly untrustworthy; particularly so if the testimony be taken after the lapse of years from the time the alleged anticipating device was used."

In the case of Symington Co. v. National Malleable Castings Co., supra, the Supreme Court, among other things, said: "This court has pointed out that oral testimony tending to show prior invention as against existing letters patent is, in the absence of models, drawings, or kindred evidence, open to grave suspicion, particularly if the testimony be taken after the lapse of years from the time of the alleged invention."

Again in the Eibel Process Company Case, supra, the Supreme Court, considering a kindred question, among other things, said: "The temptation to remember in such cases and the ease with which honest witnesses can convince themselves after many years of having had a conception at the basis of a valuable patent, are well known in this branch of law, and have properly led to a rule that evidence to prove prior discovery must be clear and satisfactory."

■ Considering the oral testimony, adduced and relied upon by appellant to es-. tablish that he conceived the involved invention prior to appellee's filing date, in connection with the admitted facts and circumstances of record, "in the light of human experience and * * * [with] such knowledge of human nature as the courts possess," we are constrained to disagree with the conclusion reached by the tribunals of the Patent Office that the evidence is sufficient to establish beyond a reasonable doubt that appellant conceived the involved invention prior to his coming in contact with appellee.

In so holding, we do not wish to be understood as questioning the honesty and good faith of appellant or the witnesses who testified for him. We base our conclusion solely on the proposition that, in view of the known facts and circumstances in the case, the oral testimony, adduced 6½ and 8½ years after the happening of events to which it was directed, in the absence of any corroborative documentary evidence, is not sufficient to warrant a holding that appellant has established beyond a reasonable doubt that he was the prior inventor.

Holding this view, it is, of course, unnecessary for us to consider other issues determined by the tribunals of the Patent Office, or presented to us by counsel for the parties. Accordingly, although we are not in accord with the reasoning of the Board of Appeals,· we concur in the conclusion reached by that tribunal.

The decision is affirmed.

Affirmed.